IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMUAL BROADBENT,<br><br>        Petitioner,<br><br>vs.<br><br>M. MARTEL, Warden, Mule Creek State Prison,<br><br>        Respondent. | No. 2:11-cv-01711-JKS<br><br>MEMORANDUM DECISION |

Jamual Broadbent, a state prisoner appearing *pro se*, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  Broadbent is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the Mule Creek State Prison.  Respondent has answered, and Broadbent has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

Broadbent and his co-defendant Humberto Diaz were convicted by a Sacramento County Superior Court jury of three counts of attempted murder (Cal. Penal Code §§ 187(a), 664) arising out of a gang-related shooting.  In December 2007 the trial court sentenced Broadbent to an aggregate prison term of thirty-five years plus an indeterminate term of fifty years to life.  The California Court of Appeal, Third Appellate District, affirmed Broadbent's conviction and sentence in an unpublished decision,[1] and the California Supreme Court denied review on February 10, 2010.  Broadbent filed his Petition for relief in this Court on June 22, 2011.

---

[1] *People v. Diaz*, No. C057586, 2009 WL 3357924 (Cal. Ct. App. Oct. 20, 2009).  The Appellate Court did correct Broadbent's presentence credits.

The factual basis underlying Broadbent's conviction were summarized by the California Court of Appeal.

In January 2006, Dorrate Hicks, who was 15 or 16 years old at the time, was walking from his house near 26th Avenue and Martin Luther King, Jr. Boulevard in Sacramento with his friend, Michael Jordan. As they were walking, Dorrate saw four men standing around a street corner talking. Dorrate suggested turning back, but Jordan kept going, and Dorrate stayed with him. As they passed the men, Jordan stopped, shook someone's hand, and asked where Ricky was. Dorrate kept walking. One of the men told Jordan they did not know where Ricky was but they would let Jordan know if they saw him. Jordan then caught up with Dorrate.

As they continued walking, one of the men (later identified as Diaz) asked, "[W]here you all from?" Dorrate took this as a "kind of . . . threatening question," meaning "what gang do you belong to?" Jordan responded, "I'm from L.A. but I don't gang bang." Diaz said something like, "[A]re you all from L.A? You all got to get [the fuck] up out of here. You all don't belong here." He also said something like, "Oak Park all mines," which Dorrate understood to mean it was their territory. Dorrate told the men they were leaving. Diaz told Dorrate, "Shut up, bitch or I'll slap you."

Dorrate (followed by Jordan) walked quickly to Christian Brothers High School, where there was more light, to call his brother Tykeymo Harrison to come get him because he did not want to walk home. Dorrate told Harrison about the incident with the four men. Harrison said he would come.

Harrison picked up Dorrate at the school next to Christian Brothers in an Oldsmobile. (Jordan had left already.) Harrison was driving, and with him in the car were their brother, Dorral; Dorral's best friend, Anthony Watson; and Harrison's friend, Javan Gaut. Harrison told Dorrate to tell him where the men were because he wanted to know why they were messing with Dorrate.

About 15 minutes after Dorrate had first encountered the men, he and the others in the Oldsmobile arrived back at the corner. The men were still there. They all got out of the car, which Harrison left running, and Diaz came into the middle of the street, as did Harrison, Watson, and Gaut. Harrison said something like, "my brother just told me one [of you] all from down here was messing with him," and Diaz turned and said something to two of the other men. In response, they walked from one corner to another and around the back of a house. Dorral and Harrison heard Diaz tell one of the other men something like, "go get a gun" or "go get the gun." Diaz then turned back and said Dorrate was not supposed to be there, "This is Oak Park Bloods. We don't know who your brother is."

At that time, Dorral recognized Diaz as someone he had seen before at a jewelry store. Dorral told Diaz he knew him, Diaz responded that he knew Dorral too, they shook hands, and Diaz said, "[E]verything cool."

Dorrate then saw the two men coming back. Gaut told the others that "they was on point and let's get up out of here." Dorrate understood "on point" to mean

2

the men had a weapon.  The two men were walking toward the car; the one in the lead was later identified as Broadbent.  Dorrate was the first one to get back in the car, then Gaut, followed by Harrison.  Before Dorral and Watson got back in, Dorral looked at Broadbent and told him everything was cool and they were leaving.  Dorral then got back in the car, and as Watson was getting in, Broadbent started shooting from just a few feet away.  The windows on the passenger side shattered, and Watson was hit in the head.  Dorrate thought there were about six gunshots; Dorral thought probably eight.  Only after the shooting stopped was Harrison able to drive away.

Dorral was shot twice—one bullet hit him in the upper right arm and traveled through his arm and chest, stopping in his neck; the other bullet struck his left wrist.  Harrison was shot in the shoulder.  Watson was shot twice-one bullet hit his left hand, but the other hit him in the head, leaving him in a vegetative state.

After the shooting, a police crime scene investigator examined the car at the hospital and saw bullet holes in the right rear passenger door and a bullet hole in the lower left front windshield.

Diaz and Broadbent were charged in a consolidated complaint with three counts of attempted murder—one count each for Watson, Dorral, and Harrison.  The complaint included various enhancement allegations, including criminal street gang enhancements on each charge.

At trial, Sacramento Police Detective Wendy Brown testified she was working in the gang suppression unit in January 2006 and was the officer who arrested Broadbent.  She was also present at Diaz's arrest two days later.  When he was arrested, Diaz had rock cocaine in a plastic baggie.

Detective Brown also testified as the prosecution's gang expert.  She testified that Ridezilla (also known as Zilla, Underworld Zilla (U.Z.), and Clap City) is a neighborhood-based gang that is made up primarily of members of the Oak Park Bloods, along with members recruited from other neighboring gangs.  Ridezilla is a "very, very violent gang" and its primary activities are "[h]omicides, attempt[ed] homicides, narcotics dealings, [and] assaults with deadly weapons."  "The rivals of Ridezilla are anyone who challenges Ridezilla."  Ridezilla members "are very, very often armed, and they are not afraid to use them."  Diaz and Broadbent were first validated as members of Ridezilla in 2005, based in part on their own admissions of gang membership.  Detective Brown expressed her opinion that the shooting was committed for the benefit of Ridezilla because "the gang . . . benefits by a show of force in answering disrespect."[2]

## II.  GROUNDS RAISED/DEFENSES

Broadbent raises eight grounds:  (1) CALCRIM 600, the "kill-zone" instruction violates the due-process clause; (2) ineffective assistance of counsel in failing to object to the

---

[2] *Diaz*, 2009 WL 3357924 at *1-2.

prosecutor's improper concurrent intent argument; (3) exclusion of Broadbent's father and brother deprived him of his Sixth Amendment right to a public trial; (4) the California ten-point test for gang validation constitutes an invalid criminal profile; (5) to the extent that the gang-expert's testimony was based upon hearsay it violated the Confrontation Clause of the Sixth Amendment; (6) the evidence was insufficient to establish special allegations; (7) failure to strike non-responsive answers in cross-examination resulted in the denial of a fair trial; and (8) denial of bifurcation of gang-related allegations rendered the trial fundamentally unfair.  Respondent contends that the Petition is untimely; and that his third (denial of public trial), fourth (gang validation test), and fifth (gang-related testimonial hearsay) are procedurally barred.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[3]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[4]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

---

[3] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade*, 538 U.S. 63, 70-75 (2003) (explaining this standard).

[4] *Williams*, 529 U.S. at 412 (alteration added).

power of the Supreme Court over federal courts.[5]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[6]  When a claim falls under the

"unreasonable application" prong, a state court's application of Supreme Court precedent must

be "objectively unreasonable," not just "incorrect or erroneous."[7]  The Supreme Court has made

clear that the objectively unreasonable standard is "a substantially higher threshold" than simply

believing that the state-court determination was incorrect.[8]  "[A]bsent a specific constitutional

violation, federal habeas corpus review of trial error is limited to whether the error 'so infected

the trial with unfairness as to make the resulting conviction a denial of due process.'"[9]  In a

federal habeas proceeding, the standard under which this Court must assess the prejudicial

impact of constitutional error in a state court criminal trial is whether the error had a substantial

and injurious effect or influence in determining the outcome.[10]  Because state court judgments of

---

[5] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[6] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[7] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[8] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[9] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[10] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

conviction and sentence carry a presumption of finality and legality, the petitioner has the burden

of showing by a preponderance of the evidence that he or she merits habeas relief.[11]

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal
> court relitigation of claims already rejected in state proceedings. *Cf. Felker v.
> Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing
> AEDPA's "modified res judicata rule" under § 2244). *It preserves authority to issue
> the writ in cases where there is no possibility fairminded jurists could disagree that
> the state court's decision conflicts with this Court's precedents. It goes no farther.*
> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme
> malfunctions in the state criminal justice systems," not a substitute for ordinary error
> correction through appeal. *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct.
> 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition
> for obtaining habeas corpus from a federal court, a state prisoner must show that the
> state court's ruling on the claim being presented in federal court was so lacking in
> justification that there was an error well understood and comprehended in existing
> law beyond any possibility for fairminded disagreement.[12]

In applying this standard, this Court reviews the "last reasoned decision" by the state

court.[13] State appellate court decisions that summarily affirm a lower court's opinion without

explanation are presumed to have adopted the reasoning of the lower court.[14] This Court gives

---

[11] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[12] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[13] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[14] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state

the presumed decision of the state court the same AEDPA deference that it would give a

reasoned decision of the state court.[15]

## IV.  DISCUSSION

**A.      Timeliness**

Respondent simply contends, without further explanation that "[i]t appears the Petition is

untimely by at least 30 days, 28 U.S.C. § 2244(d)(1)(A)."  The limitations period of

§ 2244(d)(1)(A) is an affirmative defense that must be pleaded by the Respondent.[16]  The record

in this case indicates that the California Supreme Court denied review on February 10, 2010.

Broadbent's conviction became final on direct review 90 days later when his time to file a

petition for *certiorari* in the Supreme Court expired,[17] Monday, June 14, 2010.  28 U.S.C. § 2244

provides:

> (d) (1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of—
>       (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>       (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>       (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

---

court explaining the state court's reasoning.").

[15] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[16] *Chaker v. Crogan*, 428 F.3d 1215, 1220 (9th Cir. 2005).

[17] *Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009); *Randle v. Crawford*, 604 F.2d 1047, 1055-57 (9th Cir. 2010).

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

As relevant to this case, because there were no state post-conviction proceedings involved, only one provision of § 2244 is involved, (d)(1)(A) (date the judgment of conviction became final). Thus, Broadbent's time to file his Petition in this Court expired on June 14, 2011, eight days before Broadbent filed his Petition. An untimely petition is subject to dismissal.[18]

Broadbent contends that the limitations period was equitably tolled because of his mental disability. ADEPA'S statutory limitations period may be tolled for equitable reasons.[19] To warrant equitable tolling, a petitioner "bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."[20] While a petitioner is required to pursue his rights diligently to warrant equitable tolling, the appropriate standard is "reasonable diligence," not "maximum feasible diligence."[21] A panel of the Ninth Circuit has held that equitable tolling of the limitations period governing a habeas petition is permissible when the petitioner can show mental impairment so severe that he or she was unable personally to understand the need to timely file or prepare a petition, and that the impairment made it impossible under the totality of circumstances to meet the filing deadline despite petitioner's diligence.[22] The panel then set forth the following guide:

---

[18] *Day v. McDonough*, 547 U.S. 198, 201 (2006).

[19] *Holland v. Florida*, 130 S.Ct. 2549, 2560 (2010) (citation omitted).

[20] *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (citations omitted).

[21] *Holland*, 130 S. Ct. at 2565.

[22] *Bills v. Clark*, 628 F.3d 1092, 1099-1100 (9th Cir. 2010).

In practice, then, to evaluate whether a petitioner is entitled to equitable tolling, the district court must: (1) find the petitioner has made a non-frivolous showing that he had a severe mental impairment during the filing period that would entitle him to an evidentiary hearing; (2) determine, after considering the record, whether the petitioner satisfied his burden that he was in fact mentally impaired; (3) determine whether the petitioner's mental impairment made it impossible to timely file on his own; and (4) consider whether the circumstances demonstrate the petitioner was otherwise diligent in attempting to comply with the filing requirements.[23]

In his Petition Broadbent affirmatively alleged his mental disability and its adverse impact on his ability to timely file his Petition.  In response, other than to assert the bare conclusory defense of untimeliness, Respondent does not address the issue.  In short, it does not appear that Respondent disputes what was implicitly raised in the Petition, that the limitation period was equitably tolled.  Because Respondent bears the burden of establishing entitlement to an affirmative defense and because the Respondent does not dispute Broadbent's contentions, it does not appear that an evidentiary hearing is required.  Based upon the record before it, this Court finds that Broadbent has made a *prima facie* showing that he was unable to timely file his Petition for relief in this Court due to circumstances beyond his control, i.e., his mental impairment, and Respondent has not countered that showing.  Accordingly, the Petition was timely filed.

## B.    Procedural Bar

Respondent contends that Broadbent's third (denial of public trial), fourth (gang validation test), and fifth (gang-related hearsay testimony) are procedurally barred.  A federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a ground that is independent of the federal question and adequate to support the

---

[23] *Id.* at 1100-01.

judgment."[24]  "The state-law claim may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits."[25]  Procedural default does not preclude federal habeas review unless the last state court rendering judgment in a case, clearly and expressly states that its judgment rests on a state procedural bar.[26]  "[I]n order to constitute adequate and independent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well established at the time of the petitioner's purported default."[27]  A discretionary state procedural rule can be firmly established and regularly followed, so as to bar federal habeas review, even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others.[28]  The Court agrees with Respondent that, because Petitioner's claims were defaulted in state court on an adequate and independent state ground, they will not be considered in federal habeas proceedings unless Petitioner can demonstrate cause for the default and actual prejudice, i.e., a miscarriage of justice.[29]

---

[24] *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

[25] *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011).

[26] *Teague v. Lane*, 489 U.S. 288, 298-99 (1989) (citing *Harris v. Reed*, 489 U.S. 255, 262-63 (1989)).

[27] *Morales v. Calderon,* 85 F.3d 1387, 1393 (9th Cir. 1996) (internal quotation marks and citation omitted).

[28]  *Walker v. Martin*, 131 S. Ct. 1120, 1128 (2011); *Beard v. Kindler*, 130 S. Ct. 612, 618 (2009).

[29] *See Coleman v. Thompson,* 501 U.S. 722, 729 (1991).

To prove a fundamental miscarriage of justice, Broadbent must show that a constitutional violation probably resulted in his conviction despite his actual innocence.[30]  Although at the gateway stage the petitioner need not establish his innocence as an "absolute certainty," the Petitioner must demonstrate that more likely than not, no reasonable juror could find him guilty beyond a reasonable doubt.[31]

> If a petitioner has procedurally defaulted on a claim, a federal court may nonetheless consider the claim if he shows: (1) good cause for his failure to exhaust the claim; and (2) prejudice from the purported constitutional violation; or (3) demonstrates that not hearing the claim would result in a "fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *Sawyer v. Whitley,* 505 U.S. 333, 339–40, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).  An objective factor outside of a petitioner's control (e.g., ineffective assistance of counsel or a basis for the claim that was previously unavailable) could constitute cause. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *McCleskey v. Zant,* 499 U.S. 467, 497, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).  The petitioner can meet the prejudice prong if he demonstrates "that the errors . . . worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis,* 874 F.2d 599, 603 (9th Cir.1989) (citing *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).  A petitioner can demonstrate a fundamental miscarriage of justice by "establish[ing] that under the probative evidence he has a colorable claim of factual innocence." *Sawyer,* 505 U.S. at 339, 112 S.Ct. 2514 (quotation marks omitted).[32]

Ground 3:  Denial of Public Trial

The trial court excluded Broadbent's father and brother from the courtroom.  Broadbent contends that this violated his Sixth Amendment right to a jury trial and that the right of a public

---

[30] *See Schlup v. Delo,* 513 U.S. 298, 321-25 (1995) (linking miscarriages of justice to actual innocence); *United States v. Olano,* 507 U.S. 725, 736 (1993) ("In our collateral-review jurisprudence, the term 'miscarriage of justice' means that the defendant is actually innocent."); *Murray v. Carrier,* 477 U.S. 478, 496 (1986) ("[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.").

[31] *House v. Bell*, 547 U.S. 518, 538 (2006).

[32] *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011).

trial is so fundamental that it cannot be waived by a failure to object at the time of trial.  The

California Court of Appeal rejected Broadbent's arguments.

Broadbent contends his "constitutional right to a public trial was violated when the court excluded his father and brother  from the audience without a finding that would support an 'overriding interest' or even a 'substantial basis' to justify the infringement upon his right to a public trial."  We conclude Broadbent forfeited this argument by not raising it in the trial court, and we also reject his alternate argument that his trial attorney was ineffective for failing to make this argument in the trial court.

On the day of opening statements, as the court and counsel were addressing a supplemental motion in limine outside the presence of the jury, the prosecutor notified the court that Broadbent's father and brother, who were in the hall outside the courtroom, were wearing T-shirts that displayed some sort of message about freeing Broadbent.  Broadbent's attorney left the courtroom and told them to leave and come back wearing something else.  Counsel noted there were jurors in the hallway who saw the shirts.  Accordingly, before opening statements began, the court reminded the jury not to be influenced by anything outside the courtroom, including "if you see anyone . . . wearing some clothing that might appear to be inappropriate."

The next morning, after Dorrate finished testifying, one of the jurors reported to the court that he had been in a stall in the bathroom when he heard two individuals discussing Dorrate's testimony.  The juror identified one of the individuals as Broadbent's brother.  (It was his identical twin.)  The description of the other individual the juror provided matched Broadbent's father.

Immediately thereafter, one of the other jurors and one of the alternate jurors reported to the court that a member of the audience had tried to make small talk with them in the hallway.  Their description of that person matched Broadbent's father.

Diaz's attorney requested a separate trial based on the actions of Broadbent's father and brother.  Broadbent's attorney asked that the juror who overheard the conversation in the bathroom be excused.  The prosecutor opposed both requests but asserted that the court "ha[d] enough to dismiss [Broadbent's father and brother] right now so they don't come back at 1:30."  The court asked if the matter was submitted, and all three counsel agreed it was.

The trial court denied the defense requests but found that Broadbent's father and brother had "made attempts to influence this jury.  And I'm going to have them excused from this courtroom."  After excusing the jury for lunch, the court informed Broadbent's father and brother that they were "banned from this courtroom during this pending trial" based on the shirt incident and the two conversations.

At no time did Broadbent's attorney object to or argue against the exclusion of Broadbent's father and brother from the trial.

The initial question we face is whether Broadbent's argument that the exclusion of his father and brother violated his right to a public trial is properly before us.  Broadbent acknowledges that he did not make this argument in the trial

12

court, but he offers three different reasons why "[t]his constitutional claim is reviewable despite lack of objection below."

One, Broadbent contends that "the right to jury trial cannot be forfeited by silence, but can only be waived by an express waiver from the defendant personally, and the right to a public trial is an integral component of the jury trial right." He thereby implies that the right to a public trial-here, the right to have his father and brother present at the trial cannot be forfeited by silence but must be expressly waived. Our Supreme Court has repeatedly held otherwise. (See, e.g., *People v. Bradford* (1997) 14 Cal.4th 1005, 1046-1047 ["a failure to object constitutes a waiver of the right to a public trial" and "[n]o . . . personal waiver is expressly required to waive the right to a public criminal trial"]; *People v. Catlin* (2001) 26 Cal.4th 81, 161 ["Failure to object [to closed proceedings] constitutes a waiver of the claim on appeal"].) Thus, this argument fails.

Two, Broadbent contends that his "failure to object is excused by the fact that there was no meaningful opportunity to object before the court ruled and an after-the-fact objection would have been futile." He is wrong. When the prosecutor asserted "the Court has enough to dismiss [Broadbent's father and brother] right now so they don't come back," the trial court said, "All right. Matter submitted?" At that time, Broadbent could have objected but he did not; instead, he agreed to submit the matter.

Three, Broadbent asserts his public trial argument is actually "a claim challenging the sufficiency of the evidence to support the closure order" and "[c]laims of insufficient evidence are not waived by failing to object." It is true that the rule allowing a claim of insufficiency of the evidence to be raised for the first time on appeal is not limited to judgments. (See *People v. Butler* (2003) 31 Cal.4th 1119, 1126 [challenge to an order for HIV testing].) As we have noted, however, our Supreme Court has repeatedly held that the right to a public trial can be forfeited by failure to object in the trial court, and we do not believe this principle can be avoided simply by recasting the issue as one involving the sufficiency of the evidence to support the trial court's action.

""No procedural principle is more familiar . . . than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."" (*People v. Saunders* (1993) 5 Cal.4th 580, 590.) "" "In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal."" (*Ibid.*)

Had Broadbent objected in the trial court to the exclusion of his father and brother on the ground it violated his constitutional right to a public trial, the trial court would have been alerted to the necessity of determining to what extent its

exclusion order intruded on Broadbent's rights and whether exclusion was appropriate under the facts before it and the governing case law.  Having failed to alert the trial court of the need for this determination, Broadbent cannot raise this issue for the first time on appeal as a basis for upsetting the result of the trial that followed.   Under well-established Supreme Court precedent, he forfeited this argument by failing to raise it in the trial court.[33]

Respondent argues that Broadbent's argument before this Court is procedurally barred. The Court agrees.  The California contemporaneous objection rule is "clear, consistently applied, and well-established" where, as here, a party fails to make a proper objection to the admission of evidence.[34]  The rule is therefore operative in the case at bar as an "adequate and independent" state procedural bar.[35]  Moreover, the California rule is entirely consistent with federal law as established by the United States Supreme Court, which also requires a timely objection to a ruling even where a constitutional right is involved.[36]  Broadbent is procedurally barred from bringing his third ground.

Ground 4:  Gang Validation Test

As summarized by the California Court of Appeal, the testimony on the gang validation test Broadbent objects to:

> Detective Brown testified that "[t]he 10 criteria are a person admits their membership in the gang, is tattooed with a gang logo, is in the company of other

---

[33] *Diaz*, 2009 WL 3357924 at *3-5.  Broadbent does not raise an ineffective assistance of counsel claim before this Court.

[34] *Melendez v. Pliler*, 288 F.3d 1120, 1124-25 (9th Cir. 2002).

[35] *See Collier v. Bayer*, 408 F.3d 1279, 1283 (9th Cir. 2005).

[36] Fed. R. Evid. 103(a)(1); *see generally Yakus v. United States*, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."); *Peretz v. United States*, 501 U.S. 923, 936-37 (1991).

validated gang members, has been involved in gang related crimes, is named by two or more members of their gang as a member of that gang, a photograph which indicates and shows gang membership, county or jail correspondence that indicates the gang membership, has been contacted in the field participating in gang related crimes by law enforcement, has gang graffiti, and the individual has been contacted wearing gang clothing."[37]

Broadbent contends that this testimony constituted a prohibited "profile."  The California Court of Appeal rejected Broadbent's position:

> *Gang Validation Testimony*
>
> In his pretrial motion to limit the testimony of the prosecution's gang expert, Diaz identified four numbered areas in which he wanted the court "to place reasonable and appropriate limits on the gang expert's testimony."  He then stated that "[f]urther bases for such requests are set forth below," which was followed by 20 pages of argument.  Amidst those 20 pages, under the fourth of six headings, Diaz argued that "[t]he opinions of gang experts are inadmissible because they constitute improper profile evidence," and he asked the court to "limit the gang expert's opinions and testimony so that profile evidence is not proffered to the jury."
>
> In addressing Diaz's motion, the trial court covered the four numbered areas identified at the beginning of the motion and nothing else.  At no time did either Diaz or Broadbent address the "profile" argument buried in Diaz's in limine motion or secure a ruling from the trial court on that argument.
>
> Thereafter, Detective Brown testified without objection about how Broadbent and Diaz were "validated" by law enforcement as members of Ridezilla pursuant to a list of 10 criteria developed by the Department of Justice and adopted by the Sacramento Police Department.
>
> On appeal, Broadbent contends Detective Brown's gang validation testimony was inadmissible profile evidence.  There are multiple problems with this argument.  First, no one made it in the trial court.  Although, as we have noted, Diaz buried in his motion in limine an argument that "[t]he opinions of gang experts are inadmissible because they constitute improper profile evidence," that argument did not specifically tie the claim of "profiling" to the issue of gang "validation."  Thus, while Diaz asked the court to prohibit the gang expert from offering profile evidence, Diaz never argued that the evidence of gang validation *was* profile evidence.  Accordingly, we cannot reach this argument on appeal.  (See Evid.Code, § 353, subd. (a).)
>
> Second, even if we were to assume Diaz's buried argument about inadmissible profile evidence could have been understood as relating to evidence of gang validation, neither Diaz nor Broadbent secured a ruling from the trial court on

---

[37] *Diaz*, 2009 WL 3357924 at *14 n.10.

that argument.  In his opening brief, Broadbent tries to suggest the court ruled on the argument when it "ruled that the gang expert would be able to give gang validation evidence."  The part of the transcript Broadbent cites, however, involved the trial court's ruling on two of the four numbered areas in which Diaz specifically asked the court to limit the gang expert's testimony, namely, his requests to prohibit testimony: (1) "to whether the defendant actively participated in Ridezilla or any other named alleged gang because that is unfounded, speculation and another impermissible encroachment upon the jurors exclusive function," and (2) "to what the primary activities of Ridezilla members are because the expert has insufficient knowledge upon which to base an opinion."  The court's ruling on these arguments did not include a ruling on the buried argument that the expert should be prohibited from offering inadmissible profile evidence.

"A properly directed motion *in limine* may satisfy the requirements of Evidence Code section 353 and preserve objections for appeal. [Citation.] However, the proponent must secure an express ruling from the court." (*People v. Ramos* (1997) 15 Cal .4th 1133, 1171.)  That did not happen here.

Finally, even if this argument were properly before us, we would reject it because Detective Brown's gang validation testimony was not improper profile evidence.  "A profile is a collection of conduct and characteristics commonly displayed by those who commit a certain crime," and "[p]rofile evidence is generally inadmissible to prove guilt" because it is "'inherently prejudicial'" due to "'the potential of including innocent people as well as the guilty'" within the profile. (*People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084-1085.)  Thus, in *Robbie* the appellate court concluded the trial court erred in admitting expert opinion testimony offered to prove the defendant's conduct was consistent with being a rapist.  (*Id.* at pp. 1077, 1081.)

Detective Brown's testimony that Diaz and Broadbent satisfied a number of the criteria law enforcement use to "validate" gang members was in no way similar to evidence of a criminal profile, i.e ., that by their conduct they met the profile of attempted murderers.  Accordingly, even if defendants had objected to the gang validation evidence on this basis, the trial court would not have erred in admitting the evidence over their objection.[38]

As with his third ground, the failure of Broadbent to make a contemporaneous objection to the challenged testimony is an adequate and independent state ground sufficient to procedurally bar consideration of his claim in this Court.  Broadbent is not entitled to relief under his fourth ground.

---

[38] *Id.* at *14-15.

Ground 5:  Gang-related Hearsay Testimony

To prove the predicate offenses the prosecution relied on the testimony of a gang expert who gave a factual narrative of two of the predicate offenses.  Broadbent argues that, because the gang expert was not a percipient witness to either incident, her testimony was necessarily founded on hearsay thereby violating the Confrontation Clause.  The California Court of Appeal rejected Broadbent's arguments, holding:

> Broadbent contends Detective Brown's hearsay testimony regarding the predicate offenses violated his Sixth Amendment right to confrontation under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177].  In *Crawford,* "the high court held that the confrontation clause of the Sixth Amendment to the federal Constitution prohibits 'admission of *testimonial* statements of . . . witness[es] who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'"  (*People v. Romero* (2008) 44 Cal.4th 386, 421.)
>
> We reject Broadbent's *Crawford* argument at the outset because neither defendant objected to Detective Brown's testimony regarding the predicate offenses on this ground (or *any* ground, for that matter) in the trial court.  (See *People v. Morris* (2008) 166 Cal.App.4th 363, 367 [*Crawford* objection not raised below is not preserved for appeal].)
>
> As we have noted, before trial, Diaz moved in limine to limit the testimony of the prosecution's gang expert.  One of the limits Diaz requested was to prohibit the expert from "comment[ing] on hearsay statements about [Diaz]'s association with Ridezilla."  When this aspect of Diaz's motion came up for discussion, his attorney argued that "allowing that kind of hearsay evidence . . .  [¶]  violates [his] Sixth Amendment right to a fair trial and to confront the witnesses against him."  The court rejected that argument, implicitly concluding that hearsay statements on which an expert relies to formulate an opinion are not subject to *Crawford* because the jury is instructed that such statements are not to be considered for the truth of the matter asserted.
>
> Obviously, Diaz's *Crawford* objection relating to hearsay statements about his association with Ridezilla had nothing to do with any testimony Detective Brown might offer regarding the predicate offenses necessary to establish a pattern of criminal activity.  Moreover, at no time either before or during Detective Brown's testimony about the predicate offenses did either Diaz or Broadbent assert a

*Crawford* objection—or any other objection for that matter—to that testimony.  In the absence of such an objection, the issue is forfeited.[39]

As with his third and fourth grounds, the failure of Broadbent to make a contemporaneous objection to the challenged testimony is an adequate and independent state ground sufficient to procedurally bar consideration of his claim in this Court.  Broadbent is not entitled to relief under his fifth ground.

**C.    Merits**

Ground 1:  "Kill-zone" Instruction

In his first ground Broadbent challenges the following instruction:

> *CALCRIM No. 600—The "Kill Zone" Instruction*
> The court instructed the jury on attempted murder pursuant to CALCRIM No. 600, in relevant part as follows:
> "The defendants are charged in Counts 1, 2 and 3 with attempted murder.
> "To prove that the defendants are guilty of attempted murder, the People must prove that:
> "1. The defendants took at least one direct but ineffective step toward killing another person; and
> "2. The defendants intended to kill that person.
> "[¶] . . . [¶]
> "A person may intend to kill a specific victim or victims at the same time he intends to kill anyone in a particular zone of harm or kill zone.  In order to convict a defendant of the attempted murder of Anthony Watson, Dorral Hicks or Tyke[y]mo Harrison, the People must prove that the defendant intended to kill Anthony Watson, Dorral Hicks or Tyke[y]mo Harrison, or intended to kill anyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Anthony Watson, Dorral Hicks or Tyke[y]mo Harrison by harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Anthony Watson, Dorral Hicks or Tyke[y]mo Harrison."[40]

---

[39] *Id.* at *9.

[40] *Id.* at *19-20.

Broadbent contends the kill zone paragraph of the instruction misstates the applicable law, that it erroneously named the same three victims and primary targets and kill zone targets, allowed the jury to convict him of attempted murder even if he was not shooting at anyone in particular and there was no primary target at all, and contained an irrational permissive inference. The California Court of Appeal rejected Broadbent's arguments:

1. *People v. Bland*

The "kill zone" paragraph of CALCRIM No. 600 derives from *People v. Bland* (2002) 28 Cal.4th 313. In *Bland,* the court explained that the doctrine of transferred intent applies to the crime of murder but not to "an inchoate crime like attempted murder" because "[s]omeone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder-due to transferred intent-if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Id* . at pp. 317, 328.) The court went on to explain that "[t]he conclusion that transferred intent does not apply to attempted murder still permits a person who shoots at a group of people to be punished for the actions towards everyone in the group even if that person primarily targeted only one of them . . .. [T]he person might still be guilty of attempted murder of everyone in the group, although not on a transferred intent theory . . .. [¶] . . . [A]lthough the intent to kill a primary target does not *transfer* to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within ... the 'kill zone.'" (*Id.* at p. 329.) The court noted that "[t]his concurrent intent theory is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent. Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Id.* at p. 331, fn. 6.)

2. *Evidentiary Support For The "Kill Zone" Instruction*

With this understanding of the "kill zone" or "concurrent intent" theory of attempted murder in mind, we turn to defendants' argument, beginning with Diaz's. Diaz contends the kill zone instruction was inappropriate here because "[t]he 'kill zone' principle appears to consist of two different elements: 1) a primary target; and 2) a manner of assault reasonably designed to ensure the death of the primary target by creating a lethal zone around the target, thus concurrently intending death to all within the 'kill zone' in order to make sure the intended target is killed." He asserts that "[n]either of those elements is present" here. He contends, "There was no evidence . . . that the bullets were intended to strike anyone in particular in the

19

vehicle; to the contrary, the evidence was that the shots were fired indiscriminately at all occupants of the car." Moreover, "the shooter did not . . . employ[] a manner of assault, such as firing over fifty rounds of high-powered ammunition, that would result in the death of the primary target and those close by."

The People contend the evidence supported an inference that all three named victims were Broadbent's primary targets and that "the instruction gave the jury the opportunity to find that either Anthony, Dorral, or Tykeymo, or all of them, were the primary targets." The People also contend that the amount of "firepower" is not dispositive of whether a kill zone was created or whether the kill zone instruction is warranted in a particular case.

We agree with the People on both points. Where (as here) a person fires, from close range, six to eight shots from a firearm at an automobile that more than one person is in (or getting into), there is a sufficient evidentiary basis to conclude a "kill zone" has been created because, under these facts, the shooter could harbor the intent to kill everyone within the automobile (or at least as many as he can). Thus, the "manner of assault" Broadbent employed justified a "kill zone" instruction.

Additionally, on the facts of this case it was for the jury to decide whether Broadbent had one or more primary targets within the "kill zone." There was evidence that Harrison, Dorral, and Watson left the car and met Diaz in the street, while Dorrate and Gaut remained by the car. From this evidence, the jury could have concluded all three of the victims who confronted Diaz, or some combination of them, were Broadbent's primary targets. More importantly, it was not critical to the application of the "kill zone" instruction that the jury identify one or more primary targets. If the jury, applying the "kill zone" instruction, found that Broadbent intended to kill everyone inside (or getting into) the car, then the jury necessarily found that Broadbent intended to kill each of the three victims, whether any of them was the primary target. (See *People v. Stone* (2009) 46 Cal.4th 131, 140 ["a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person"].)

In summary, Diaz has failed to show any error in the giving of the "kill zone" instruction. Accordingly, we turn to Broadbent's arguments.

### 3. *Elimination Of Intent To Kill*

Broadbent first contends "CALCRIM No. 600 misstates the applicable law by describing the 'kill zone' theory [a]s an alternative way to satisfy the mental element of the offense [of attempted murder] that can be used even if the jury cannot find a specific intent to kill every named victim." Broadbent premises this argument on the use of the word "or" in the instruction, where (in this case) the instruction told the jury, "In order to convict a defendant of the attempted murder of Anthony Watson, Dorral Hicks or Tyke[y]mo Harrison, the People must prove that the defendant intended to kill Anthony Watson, Dorral Hicks or Tyke[y]mo Harrison, *or* intended to kill anyone within the kill zone." (Italics added.)

Contrary to Broadbent's argument, as given here CALCRIM No. 600 did not tell the jury "an actual specific intent to kill the victim is not required if the kill zone

theory applies." First, the instruction told the jury that to prove defendants were guilty of attempted murder, the People had to prove that defendants took a direct step toward killing another person and "intended to kill *that* person." (Italics added.) The "kill zone" portion of the instruction then informed the jury that "[a] person may intend to kill a specific victim or victims *at the same time* he intends to kill anyone in a particular zone of harm or kill zone." (Italics added.) The instruction explained that the People had to prove defendants intended to kill Watson, Dorral, or Harrison, "or .. . anyone in the kill zone." Finally, the instruction informed the jury that it had to acquit if it had a reasonable doubt whether defendant intended to kill Watson, Dorral, or Harrison "by harming everyone in the kill zone."

Taken as a whole, the instruction did not substitute the concept of a "kill zone" for the requirement of a specific intent to kill the named victims. Rather, the instruction properly conveyed the idea that if defendants intended to kill everyone in, or getting into, the car-which was plainly the "kill zone" in this case—then they necessarily intended to kill the named victims, who were all shot while in that "kill zone." As given here, CALCRIM No. 600 did not misstate the law.

4. *Primary Target Requirement*

Broadbent next argues that a "kill zone" instruction requires "[t]he identification of a primary target," and here "[i]t was error to name the same three individuals as primary targets and kill zone targets." Thus, in his view, "the [kill zone] instruction was both erroneously worded and inapplicable to the facts of this case."

We have largely disposed of this argument already in rejecting Diaz's challenge to the "kill zone" instruction. On the facts of this case, it was for the jury to decide whether Broadbent had one or more primary targets within the "kill zone" of the car, and if he did, who those targets were. Broadbent points to no authority to support his suggestion that the jury cannot be allowed to decide what person or persons were the primary target, assuming there was one. Moreover, as we have concluded already, identification of a primary target is not critical to application of the "kill zone" theory. What is central to the idea of a "kill zone" is the use of a means of killing that is directed at an area where more than one person is present and that has the ability to kill more than one person. In such a situation, a jury may infer that the defendant intended to kill everyone—or at least as many persons as he possibly could—within that "kill zone" and thus may find the defendant guilty of as many counts of attempted murder as there were persons within the "kill zone" that the defendant tried to kill.

Broadbent complains that if no primary target is required, then the "kill zone" theory "would apply whenever someone shoots indiscriminately into a group," which would be error "because 'an attempted murder is not committed as to all persons in a group simply because a gunshot is fired indiscriminately at them.'" (*People v. Anzalone* (2006) 141 Cal.App.4th 380, 392.) This assertion may be true where *a* gunshot is fired. (See *People v. Stone, supra,* 46 Cal.4th at p. 138 [concluding "[t]he kill zone theory simply does not fit" where the defendant was charged with one count of attempted murder for firing a single gunshot at a group].) But it is not true

where—as here—multiple gunshots are fired and multiple counts of attempted murder are charged.

Addressing the "kill zone" theory, the Court of Appeal in *Anzalone* concluded that "to be found guilty of attempted murder, the defendant must either have intended to kill a particular individual or individuals or the nature of his attack must be such that it is reasonable to infer that the defendant intended to kill everyone in a particular location as the means to some other end, e.g., killing some particular person." (*People v. Anzalone, supra,* 141 Cal.App.4th at p. 393.) More recently, however, the Supreme Court explained that "[a]lthough a primary target often exists and can be identified, one is not required." (*People v. Stone, supra,* 46 Cal.4th at p. 140.) Thus it follows that a person can be found guilty of attempted murder if the nature of his attack is such that it is reasonable to infer he intended to kill everyone in a particular location, whether there was some other end involved. And under the "kill zone" theory, there can be as many charges of attempted murder as there are potential victims. Here, Broadbent fired six to eight shots into a car containing (or about to contain) five persons; he and Diaz were subsequently charged with three counts of attempted murder—one for each person struck by a bullet. Under these circumstances, the jury was properly instructed on the "kill zone" theory, even if there was no primary target.

### 5. *Irrational Permissive Inference*

Broadbent next argues that "[t]he 'kill zone' portion of CALCRIM No. 600 erroneously eliminated the need to find a specific intent to kill each named victim by giving the jury the option to apply an irrational permissive inference as an alternative way to find an implied intent to kill others, based on their presence in the so-called 'kill zone.'" In Broadbent's view, if the jury could not find an actual intent to kill the named victims, the instruction nonetheless allowed the jury to "infer an implied intent to kill based on" "where the victims are situated." Broadbent contends the instruction thus violates due process.

We have concluded already that, taken as a whole, the attempted murder instruction here did not offer the concept of a "kill zone" as an alternative to the requirement of a specific intent to kill the named victims. Rather, the instruction properly conveyed the idea that if defendants intended to kill everyone in the "kill zone" of the car, then they necessarily intended to kill the named victims, who were in that zone.

Moreover, "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*People v. Mendoza* (2000) 24 Cal.4th 130, 180.) CALCRIM No. 600 does not run afoul of this principle because the instruction does not tell the jury that it can find an implied intent to kill based solely on the victim's presence in an "imaginary area" known as the "kill zone." Rather, the instruction properly tells the jury (in the words of the Supreme Court in *Bland* ) that "a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*People v. Bland, supra,* 28 Cal.4th at p. 331, fn. 6.) Whether the jury decides to find a concurrent intent to kill multiple victims located within a given "zone" is

something left to the jury based on all of the evidence before it.  Nothing about the "kill zone" portion of CALCRIM No. 600 permits or encourages the jury to draw an irrational inference in this regard, and therefore the instruction does not violate due process.[41]

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.[42]  Consequently, the California Court of Appeal having held that the challenged instruction correctly stated state law, this ends the inquiry to the extent that Broadbent argues that the "kill-zone" instruction misstates the law.[43]

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."[44]  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.[45]  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.[46]  It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right and may not be

---

[41] *Diaz*, 2009 WL 3357924 at *20-24.

[42] *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

[43] *Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied); *see Waddington v. Sarausad*, 555 U.S. 179, 189, n.5 (2009) ("The Washington Supreme Court expressly held that the jury instruction correctly set forth state law, . . . and we have repeatedly held that 'it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions.'" (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991))).

[44] *Boyde v. California,* 494 U.S. 370, 380 (1990).

[45] *Francis v. Franklin*, 471 U.S. 307, 309 (1985).

[46] *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh,* 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Franklin*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.[47]  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn.[48]  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation."[49]  In this case, the California Court of Appeal assiduously adhered to those principles in rejecting Broadbent's contentions.

Broadbent's claim that CALCRIM 600 permitted the jury to impermissibly infer intent to kill by circular reasoning suffers the same infirmity.  A permissive inference requires a rational connection between the basic facts that the prosecution proved and the ultimate fact presumed, and the latter is more likely than not to flow from the former.[50]  A permissive inference leaves the trier of fact free to credit or reject the inference and the party challenging it must demonstrate its invalidity as applied to him.[51]  This Court cannot say that it was irrational to infer that in firing six to eight shots at close range at a vehicle containing multiple occupants the shooter intended to kill all of those persons who were logically within the lethal zone of that gunfire.[52]

Consequently, this Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as

---

[47] *McGuire*, 502 U.S. at 72.

[48] *Id*. at 72-73.

[49] *Id*.

[50] *See County Court of Ulster County, N. Y. v. Allen*, 442 U.S. 140, 157 (1979).

[51] *Id*.

[52] *See Ngo v. Giurbino*, 651 F.3d 1112, 1114-15 (9th Cir. 2011).

determined by the Supreme Court of the United States" at the time the state court rendered its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[53]   Broadbent is not entitled to relief under his first ground.

<u>Ground 2:  Ineffective Assistance of Counsel</u>

Broadbent argues that his trial counsel was ineffective because he failed to object to what Broadbent characterizes as the prosecution's erroneous argument in closing summation on the application of the concurrent intent theory of the kill zone.  The California Court of Appeal rejected this argument as well:

> 6.  *Ineffective Assistance Of Counsel*
> 	Finally, we turn to Broadbent's claim of ineffective assistance of counsel relating to the prosecutor's argument about the "kill zone" theory.  At first, the prosecutor argued, "I'll submit to you if you stand within a few feet of a car and you empty a gun and you fill that car up with lead and you empty your gun, you are trying to kill everyone in it."  But then the prosecutor continued, addressing "something that we call the kill zone."  On that, she argued as follows:
> 	"This is where—this exists and this is the law that is often applied when a person intends to kill one person and he's aware that people are in close proximity to his intended target, they are so close that the law is and you determine that they have concurrent intent.  That's what it is.  "It doesn't matter if you feel that Jam[u]al Broadbent intended to kill everyone individually in that car.  Maybe he intended only to kill [Harrison] or Dorral or [Watson].  The other shots followed.  Concurrent intent.  He's charged with three counts, not the full six.  He could have been charged with the six.  Clearly the same intent was there.  Concurrent intent on the other victims.  You'll see it.  You'll read it.  You can talk about it.
> 	"You'll see this whenever you have a crowd of people, somebody drives by, does a drive-by, shoots into a crowd of folks intending to kill one guy, knows the danger involved, find concurrent intent at the same time he tries to kill that person."
> 	As Broadbent argues, the prosecutor's argument erroneously suggested that defendants did not have to intend to kill all three victims to be convicted of attempting to murder all three of them.  Broadbent asserts that his trial attorney's failure to object to the prosecutor's erroneous argument, and failure to "disabuse the

---

[53] 28 U.S.C. § 2254(d); *see also Andrade,* 538 U.S. at 70-75 (explaining this standard).

jury of the prosecutor's erroneous argument during the defense summation," constituted ineffective assistance of counsel.

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense . . .. Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.)

In asserting that his trial attorney's failure to object to the prosecutor's erroneous argument regarding the "kill zone" theory prejudiced him, Broadbent does not attempt to frame an argument rooted in the facts and circumstances of this case. Instead, he simply offers a quote from *Anzalone*, and concludes, "The same is true here." That does not suffice.

In *Anzalone*, the defendant was charged with four counts of attempted murder for shooting twice at a group of four men standing near a car. (*People v. Anzalone, supra*, 141 Cal.App.4th at pp. 383-385.) Unlike here, the trial court did *not* instruct on the "kill zone" theory of concurrent intent, but the prosecutor argued that theory, telling the jury-erroneously-that "'[a]nytime someone is within the zone of danger, whether it be one, two, three or twenty people, somebody indiscriminately shoots toward a crowd of people, everything in that zone of danger qualifies . . .. That is how we get to the four counts of attempted murder.'" (*Id.* at pp. 390-391.)

The Court of Appeal noted that "[t]he prosecutor's argument incorrectly suggest[ed] that a defendant may be found guilty of the attempted murder of someone he does not intend to kill simply because the victim is in some undefined zone of danger." (*People v. Anzalone, supra*, 141 Cal.App.4th at pp. 392-393.) The court then concluded that trial counsel's failure to object to the erroneous argument was prejudicial because "[t]aking the court's proper instructions and the prosecutor's erroneous argument together, the jury would have reasonably understood that to find attempted murder it was required to find appellant intended to kill at least one of the men standing by the car; but once it did so, it could find appellant guilty of three additional counts of attempted murder simply because the other victims were in the 'zone of danger.'" (*Id.* at p. 396.)

In arguing that what was true in *Anzalone* "is true here," Broadbent fails to recognize that the trial court here, unlike the trial court in *Anzalone, did* instruct the jury on the "kill zone" theory of concurrent intent. Moreover, as detailed above, we have found no error in the court's instruction on that subject because the instruction properly conveyed the idea that if defendants intended to kill everyone in the "kill zone" of the car, then they necessarily intended to kill the named victims, who were in that zone. Thus, this case is not comparable to *Anzalone*, where the only guidance the jury received on the "kill zone" theory was the prosecutor's erroneous argument.

There were other material differences in the attempted murder instructions in the two cases also. Here, unlike in *Anzalone* (see *People v. Anzalone, supra*, 141 Cal.App.4th at p. 390), the trial court instructed the jury that to prove defendants were guilty of attempted murder, the People had to prove defendants took a direct step toward killing another person and "intended to kill *that* person." (Italics added.)

"Absent evidence to the contrary, we must assume that the jury followed the court's instructions." (*People v. Talhelm* (2000) 85 Cal.App.4th 400, 409.)  Indeed, "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Here, given that the trial court's "kill zone" instruction—which the jury received *after* the prosecutor's erroneous argument—was correct, and given the unrebutted assumption that the jury understood and followed the instruction (instead of the erroneous argument that preceded it), we see no reasonable probability the result would have been different if Broadbent's trial attorney had objected to the prosecutor's argument.  Accordingly, his ineffective assistance of counsel claim fails.[54]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Broadbent must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[55]  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."[56]  Petitioner must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[57]  An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."[58]  In applying this latter standard, the Supreme

---

[54] *Diaz*, 2009 WL 3357924 at *24-26.

[55] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[56] *Id*.

[57] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

[58] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." (citing *Strickland*, 466 U.S. at 687)); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is recognized not for its own sake, but because of the

Court has explained that, if the outcome might have been different as a result of a legal error, the

defendant has established prejudice and is entitled to relief.[59]   An ineffective assistance of

counsel claim should be denied if the petitioner fails to make a sufficient showing under either

one of the *Strickland* prongs.[60]

     As the California Court of Appeal noted, the jury was instructed correctly and it is

presumed that the jury follows its instructions.[61]   It is also recognized that, as a general principle,

arguments of counsel generally carry less weight with the jury than do instructions from the

court.[62]   In light of these two principles, this Court cannot say that the determination by the

California Court of Appeal that Broadbent was not prejudiced by the failure of his trial counsel to

object to the prosecutor's erroneous argument was "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United

States" or "was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."[63]   Nor, viewing the matter through the doubly-

deferential lens of *Mirzayance-Richter*, can this Court find that the state court unreasonably

---

effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged
conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not
implicated." (citations omitted)).

    [59] *See Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531
U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393.

    [60] *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and
need not address both prongs if the defendant fails on one).

    [61] *Weeks*, 528 U.S. at 234; *Marsh,* 481 U.S. at 206; *see Franklin*, 471 U.S. at 323-24 &
n.9.

    [62] *See Boyde v. California*, 494 U.S. 370, 384-85 (1990).

    [63] 28 U.S.C. § 2254(d).

applied the correct legal principle to the facts of the Petitioner's case within the scope of

*Andrade-Williams-Landrigan-Richter*; i.e., the state court decision was not more than incorrect

or erroneous, its application of clearly established federal law was not objectively unreasonable.

Broadbent has failed to establish that counsel committed any error that was so serious that

counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that his

defense was prejudiced, as required by *Strickland-Hill*.

Ground 6:  Insufficiency of the Evidence (Special Allegations)

Broadbent contends that the there was insufficient evidence to support the two predicate

offenses necessary for the gang-related enhancements.  The California Court of Appeal

disagreed, holding:

*Predicate Offenses*

Broadbent offers several arguments on appeal relating to the predicate offenses on which the prosecution relied to qualify Ridezilla as a criminal street gang within the meaning of Penal Code section 186.22.  We address those arguments in turn.

1. *Sufficiency Of The Evidence*

Broadbent contends the evidence was insufficient to prove the predicate offenses because the only evidence of the offenses was hearsay testimony offered by Detective Brown, which the trial court had already ruled would not be admitted for the truth of the matters asserted.  We disagree.

Under subdivision (b)(1) of section 186.22, a person "who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" is subject to an additional term of imprisonment. For purposes of this sentence enhancement provision, a "criminal street gang" is "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)  A "'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [certain enumerated] offenses . . . ."  (*Id.,* subd. (e).)  These offenses are

commonly referred to as "predicate offenses." (See *People v. Zermeno* (1999) 21 Cal.4th 927, 931.)

"It is incumbent upon the prosecution in seeking an enhancement under section 186.22, subdivision (b), to prove through competent evidence the elements of a 'criminal street gang' as set out in the statute, including the offenses necessary to satisfy the pattern requirement." (*In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 1004.)

With this understanding of the predicate offense requirement, we turn to the procedural background of Broadbent's argument.

Before trial, Diaz filed a written motion in limine to limit the testimony of the prosecution's gang expert. Among other things, Diaz asserted "[t]he gang expert should not be allowed to comment on hearsay statements about [Diaz]'s association with Ridezilla." He also asserted that the expert's opinion about the primary activity of Ridezilla was inadmissible "because it is hearsay and lacks foundation." Diaz did not assert a hearsay objection to any potential testimony regarding the predicate offenses to be used to establish a pattern of criminal activity by Ridezilla. Instead, Diaz argued only that "[t]his element must be established by 'substantial evidence.'"

In addressing Diaz's motion in limine, the court and counsel first addressed Diaz's assertion that the gang expert "should not be allowed to testify to [Diaz]'s state of mind or give an opinion that [he] had the intent to promote or assist the gang because that is an impermissible encroachment upon the jury's exclusive function." Diaz's attorney conceded she did not think the prosecutor "would try to elicit an opinion on an ultimate fact from a gang expert," but she argued "that having an expert testify Mr. Diaz is—is a validated gang member, this is what his gang does, this particular crime was gang related, is tantamount to the same thing." In discussing this argument, the court observed generally that "the facts [to] which the [gang expert] testifies in formulating that opinion are not being offered for the truth of the matter asserted. They're being offered to show the basis on which the expert is relying." Ultimately, the court ruled the gang expert would "be allowed to give an opinion as to whether or not these defendants in this particular instance acted for the benefit of, and association with or at the direction of a criminal street gang."

Later, in discussing Diaz's assertion that the gang expert should not be allowed to comment on hearsay statements about Diaz's association with Ridezilla, Broadbent's attorney argued that if the court allowed such testimony, it should "admonish the jury that they're not to take any of it as proof of the truth of the matter." The court ruled that such testimony would be allowed because "[t]he case law makes clear that experts can rely on hearsay statements . . . in formulating their opinion."

During these pretrial discussions of Diaz's motion in limine, there was no discussion about any potential testimony regarding the predicate offenses to be used to establish a pattern of criminal activity.

At the end of the prosecutor's voir dire of Detective Brown to establish her as a gang expert, Diaz's attorney reiterated her objection to any opinion testimony based on hearsay. When the court pointed out that "the case law recognize[s] that

[hearsay] is the type of evidence that experts normally rely upon" and the evidence is admissible because "it's being offered to show the—expert's opinion and basis of that opinion," Diaz's attorney asked if the court would "consider giving an admonition to the jury."  The court noted that it had, in some cases, instructed the jury on the use of hearsay evidence "consistent with the CALCRIM" "prior to the proffered testimony," and in some cases the attorneys had "fashion[ed] instructions that essentially allow the jurors to focus on the evidence that is—is subject to the expert's opinion."  The court then observed that in some cases the expert may testify to "things [that] relate to the nature of the offense," and the court specifically observed that "Detective Brown was also an investigating officer in this case so that it—she testifies to it as a per[cipi]ent witness."  The court explained that sometimes the attorneys fashioned custom instructions "pinpoint[ing] what evidence they're referring to" because some evidence may be admitted for multiple purposes.

Diaz's attorney declined to prepare such an instruction and instead asked the court to "just read the general instruction."  Subsequently, before Detective Brown resumed testifying, the court instructed the jury with CALCRIM No. 1403 on the limited use of evidence of gang activity.  This instruction did not address the use of hearsay evidence

Thereafter, in the course of her testimony, Detective Brown testified without objection to two predicate offenses involving Ridezilla members.  First, she testified about an incident in which a female member of the Oak Park Bloods got into an altercation with a member of a rival Crips gang during which she shot the rival gang member "because the Ridezilla gang members told her to do so."  Second, she testified about an incident in which eight Ridezilla members shot up a house, and one of the gang members (David Perkins) was struck and killed by a bullet fired by one of his fellow gang members.  She testified that she personally worked on both cases and that she was involved in interviewing the female gang member involved in the first incident.

In instructing the jury at the end of the case, the court gave CALCRIM No. 1403 (the limited use of evidence of gang activity) again.  The court also gave CALCRIM No. 360, which told the jury, "Wendy Brown testified that in reaching her conclusions as an expert witness she considered statements made by others.  You may consider those statements only to evaluate the expert's opinion.  Do not consider those statements as proof that the information contained in the statements is true."

We now turn back to Broadbent's argument.  He contends the prosecutor "failed to present any competent evidence to establish" the two predicate offenses because "[n]o percipient witness to either crime testified."  Instead, the prosecutor "relied solely on the testimony of the gang expert," but "[b]ecause she was not a percipient witness to either offense, [her] testimony as to the facts of each incident was necessarily hearsay."  "The jury was specifically instructed that hearsay testimony given by the expert . . . *cannot* be considered for the truth of the matter asserted."  Because "[j]urors are presumed to follow limiting instructions," Detective Brown's "hearsay accounts of how the predicate offenses occurred cannot supply substantial evidence" of the commission of those offenses.

Broadbent's argument fails for one simple reason: Detective Brown's testimony about the predicate offenses did not fall within the limiting provisions of CALCRIM No. 360. By its terms, that instruction applied only to "statements made by others" that Detective Brown testified she considered "in reaching her conclusions as an expert witness." Thus, for example, to the extent Detective Brown considered statements made by others in reaching her opinion that the attempted murders of Harrison, Watson, and Dorral were committed for the benefit of a criminal street gang, CALCRIM No. 360 told the jurors they were "not [to] consider those statements as proof that the information contained in the statements is true." But in testifying to the occurrence of the two predicate offenses, Detective Brown was not expressing any opinion or conclusion she reached as an expert witness. Rather, she was testifying to facts she became aware of as an investigating officer of both the predicate crimes. True, even as an investigating officer she may not have had personal knowledge of the facts of the incidents and may have come by her knowledge of those facts only through statements made by others, but this only made her testimony regarding the predicate offenses subject to a hearsay/lack of personal knowledge objection that defendants never made; it did not make her testimony regarding those offenses subject to the limiting effects of CALCRIM No. 360, which applied only to her testimony as an expert witness.

Because the limiting instruction did not apply to Detective Brown's testimony about the predicate offenses, that testimony could and did constitute substantial evidence of those offenses, and Broadbent's argument to the contrary is without merit.[64]

Reduced to its essence, Broadbent's entire argument is that the California Court of Appeal erred in its determination that the evidence of the predicate offenses, upon which the gang-related enhancements rested in part, was properly considered.[65] Unfortunately for Broadbent, he has not presented a question of constitutional dimension. Whether or not the instruction limiting consideration of the hearsay testimony given by the expert applied is strictly a question of state law beyond the purview of this Court.[66] To the extent that Broadbent argues

---

[64] *Diaz*, 2009 WL 3357924 at *5-8.

[65] Broadbent does not argue that, if the challenged testimony was properly considered it did not constitute sufficient evidence of the necessary predicate offenses.

[66] *Cooke*, 130 S. Ct. at 863 (holding that it is of no federal concern whether state law was correctly applied).

that consideration of the hearsay evidence violated the Confrontation Clause under the ruling in *Crawford*, as discussed above with respect to his fifth ground, because he did not properly object Broadbent is procedurally barred from asserting that claim before this Court.  Broadbent is not entitled to relief under his sixth ground.

Ground 7:  Failure to Strike Non-responsive Answers

Broadbent contends that the failure of the trial court to strike non-responsive answers given to questions propounded to a prosecution witness by counsel for Broadbent on cross-examination in violation of an *in limine* ruling, violated his due process rights to a fair trial. Broadbent also claims that the failure of the prosecutor to correct the non-responsive answer amounted to prosecutorial misconduct.  The California Court of Appeal agreed that the responses should have been stricken but declined to rule on the prosecutorial misconduct claim as unnecessary and held that the error was nonetheless harmless.

> 3.  *Nonresponsive Answers*
>
> During the discussion of in limine motions, Diaz's attorney told the court that the prosecutor might use the Perkins incident as one of the predicate offenses to establish a pattern of criminal activity by Ridezilla, and she had "intended to make" a motion under Evidence Code section 352 to exclude any "identification of either defendant as having been there," but the prosecutor had told her she did "not intend to introduce evidence to the extent she has it—that Mr. Diaz was present at the Perkins incident," so Diaz's attorney was "satisfied about that."  The prosecutor confirmed she was "not going to be getting into the fact that Mr. Diaz and Mr. Broadbent were named as two of the shooters within the—the eight or nine people [who] were out on the street on the day that David Perkins died" or "the fact that—that Mr. Diaz was implicated by his co-defendant in that particular shooting."
>
> During his cross-examination of Detective Brown, Broadbent's attorney asked her certain hypothetical questions about whether U.S.C. (University of Southern California) alumni could be considered a criminal street gang.  Later, during recross-examination, Broadbent's attorney questioned her about the use of the Perkins shooting to establish that Ridezilla is a criminal street gang.  He then returned to his "hypothetical about U.S.C. alumni" being "a criminal street gang" and asked her if she thought that was "ridiculous."  Detective Brown responded, "The ridiculous part about it is that . . . we've already established the fact that they are not

a criminal street gang.  [¶]   If you want to tell us about the crimes that they've committed, that's fine, but it doesn't make them a street gang."   The following exchange then occurred:

"Q  Well, when you testified to these two incidents that members of the oak or the Ridezilla group committed, the purpose of that was to show that because these crimes were committed by other members it follows, therefore, that Ridezilla is a criminal street gang.  In other words, the purpose is defined by the conduct of its members.

"A  Yes.  The purpose is defined by the conduct of its members, and its members are the people who committed these acts, *including your client.*

"Q  Well, to establish a predicate offense under this law you don't have to establish that the people who are on trial in a given case had anything to do with those crimes; do you?

"A  You don't have to, *but in this circumstances it is the case.*

"Q  Okay.  But you don't have to?" (Italics added.)

At this point, Diaz's attorney asked to approach, but instead Broadbent's attorney withdrew the question.  Shortly thereafter, Broadbent's attorney concluded his examination, and the prosecutor said she was "going to need to approach the bench."

Outside the presence of the jury, the prosecutor argued that the questions by Broadbent's attorney had "opened" "the door" "for a thorough answer [that] would reveal that Mr. Broadbent according to this expert's opinion was involved in the . . . Perkins shootout."  Broadbent's attorney asserted that he intended "to establish the parameters of the law, particularly the parameters of the predicate offenses, and not to assert the innocence of Mr. Broadbent regarding the particular incident."  The prosecutor argued that "asking the question the way it was asked, both questions, particularly the last question, which is a follow-up of the first question, suggests and places at least his client in a false light given what he knows."  Broadbent's attorney ultimately said, "Frankly, I think it was nonresponsive, and I would move to strike it, but whether it stays or doesn't stay, that's—I think that should be the end of it."  The court concluded that "the question could have been interpreted in more than one way, and the manner in which Detective Brown interpreted the question was actually the appropriate way to address it, . . . and . . . the question and answer [are] going to stand."  Diaz's attorney requested that "the last question and answer be stricken from the record" because Detective Brown's answer to that question implicated Diaz.  In response, the prosecutor continued to assert that she should be allowed "to get into the prior gang crimes of Mr. Broadbent," and she asserted that by doing so "it would clean up" the implication relating to Diaz.  The court concluded the prosecutor did not "need to do that" and the answer did not need to be stricken either "because . . . the answer that was given is the correct statement of the law."  The court later reiterated its belief that Detective Brown's responses "were totally correct" and "what occurred was exactly what should have occurred."  The court decided "to leave the question and answer as is" because "[w]e know at least there is some evidence that [Detective Brown was] speaking truthfully based on the question that was posed, that

34

it wasn't true in this case, because arguably the defendants do have some involvement in at least one of the predicate offenses."

On appeal, Broadbent contends the portions of Detective Brown's answers in which she tied Broadbent to the predicate offenses (italicized above) should have been stricken as nonresponsive. (See *People v. Bell* (2007) 40 Cal.4th 582, 611, fn. 11 ["A nonresponsive answer is properly the subject of a motion to strike"].)

The People assert there was no error because "Broadbent's defense counsel did not unequivocally request that Detective Brown's answers be stricken." We disagree. Broadbent's attorney asserted the answer was "nonresponsive" and he "would move to strike it," and the trial court plainly understood this was a motion to strike because the court expressly ruled that "the question and answer [are] going to stand," thereby denying the motion. Furthermore, Diaz's attorney thereafter made an unequivocal motion to strike, which the trial court also denied.

In the absence of any argument by the People that Detective Brown's answers were responsive to the questions from Broadbent's attorney, we agree with Broadbent that the trial court should have stricken the nonresponsive portions of those answers. Detective Brown's assertion in response to the first question that Broadbent ("your client") was one of "the people who committed these acts" was not responsive to anything in the question, but was a gratuitous addition. Detective Brown may have believed Broadbent's attorney was attempting to insinuate by his question that Broadbent was not involved in the Perkins incident and may have wanted to counter that insinuation, but it was not her place to do so, particularly when the prosecutor had advised her "that she should present the predicate [offense] in a clean manner omitting reference that [defendants] were . . . two of the . . . six shooters out in the street in addition to Mr. Perkins." The same conclusion applies to the second question. While Detective Brown may have felt Broadbent's attorney was trying to insinuate that Broadbent was not involved in the Perkins incident, his question asked only for her to identify what is required generally to establish a predicate offense, and her additional statement, "but in this circumstance it is the case," was nonresponsive to that question

Broadbent contends he was prejudiced by the trial court's failure to strike the nonresponsive portions of Detective Brown's answers because "the evidence against [him] was weak in terms of eyewitness identification and provocation" and "[t]he predicate offenses were inflammatory and prejudicial." To establish prejudice, Broadbent must persuade us there was a reasonable probability he would have obtained a more favorable result in the absence of the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) He has not done so. First, we do not share Broadbent's assessment of the evidence against him as "weak." Second, no matter how close the case may have been, we do not find a reasonable probability that the isolated responses from Detective Brown suggesting Broadbent was involved in at least one of the predicate offenses made a difference to the jury's resolution of the charges against him. Stated another way, Broadbent has given us no reason to believe it is reasonably probable that in a 10-day trial, these two brief statements were material

to the jury's decision.  Accordingly, we conclude the trial court's error in failing to strike the nonresponsive answers was harmless.[67]

Even assuming that the failure to strike the challenged testimony constituted prosecutorial misconduct[68] and that the objection was properly preserved in the trial court,[69] Broadbent would not prevail.  Before this Court may grant relief, it must find that any constitutional error was not harmless.  Specifically, under *Brecht*,[70] this Court must find that the error "had [a] substantial and injurious effect or influence in determining the [outcome]."[71]  This standard is a more forgiving standard of review than the *Chapman*[72] "beyond a reasonable doubt" standard.[73]  This Court applies the *Brecht* standard without regard to the state court's harmlessness determination.[74]  The determination by a state court that a constitutional error is harmless is itself subject to the unreasonableness test of AEDPA.[75]  While numerous cases in applying *Brecht* refer to the overwhelming evidence of the petitioner's guilt,[76] this tends to overstate the quantum of evidence

---

[67] *Diaz*, 2009 WL 3357924 at *9-11.

[68] *Napue v. Illinois*, 317 U.S. 264, 269 (1959).

[69] Although he raised the prosecutorial misconduct claim in the Court of Appeal, Broadbent does not claim that he raised a prosecutorial misconduct objection in the trial court.

[70] *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

[71] *Id.* at 622; *see Fry v. Pliler*, 551 U.S. 112, 121 (2007) (holding that the *Brecht* standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

[72] *Chapman v. California*, 386 U.S. 18, 24 (1967).

[73] *Fry*, 551 U.S. at 116.

[74] *Merolillo v. Yates*, 663 F.3d 444, 455 (9th Cir. 2011).

[75] *Fry*, 551 U.S. at 119-20.

[76] *See e.g., Moses v. Payne*, 543 F.3d 1090, 1100 (9th Cir. 2008); *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008); *Jackson v. Brown*, 513 F.3d 1057, 1082 (9th Cir. 2008); *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007).

necessary to establish harmless error under *Brecht*.[77]  "Only if the record demonstrates that the jury's decision was substantially influenced by the error or there is grave doubt about whether an error affected a jury will [a habeas petitioner] be entitled to relief."[78]

Prosecutorial misconduct with respect to the introduction of evidence violates due process only if the evidence "taken as a whole" gives a jury a "false impression."[79]  Here, as the California Court of Appeal noted, the claimed error involved two relatively innocuous statements made during a ten-day trial.  Based upon the record, this Court cannot say that the determination by the California Court of Appeal that the error was harmless was not just incorrect or erroneous, but was objectively unreasonable.[80]  Broadbent is not entitled to relief under his seventh ground.

Ground 8:  Refusal to Bifurcate

Prior to trial, Broadbent moved to bifurcate the trial on the criminal street gang enhancement allegations from the substantive charges.  Broadbent contends that the trial court abused its discretion in denying the motion, and that denial of bifurcation resulted in gross unfairness amounting to a denial of due process.  The California Court of Appeal rejected Broadbent's contentions holding that, under California law, a "trial court has broad discretion to deny bifurcation of a charged gang enhancement," and that the trial court did not abuse its discretion in denying the motion.[81]  This ground fails because neither an alleged mistake of state

---

[77] *See, e.g., Brecht,* 507 U.S. at 639 (finding harmless error in part because "the State's evidence of guilt was, if not overwhelming, certainly weighty").

[78] *Sechrest v. Ignacio*, 549 F.3d 789, 808 (9th Cir. 2008) (citations and internal quotation marks omitted).

[79] *Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (per curiam).

[80] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003).

[81] *Diaz*, 2009 WL 3357924 at *16.

law nor an allegation of abuse of discretion present a question of constitutional dimension cognizable in this Court.[82]

## V.  CONCLUSION AND ORDER

Broadbent is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[83]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[84]

The Clerk of the Court is to enter judgment accordingly.

Dated:  November 20, 2012.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[82] *Cooke*, 130 S. Ct. at 863 (holding that it is of no federal concern whether state law was correctly applied); *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law.  § 2254(d)(1).")

[83] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[84] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.